**UNITED STATES of America,
Plaintiff,**

v.

**Jorge Carlos RODRIGUEZ, Defendant.**

**No. Civ.A. 92–CR–248–WD.**

United States District Court,
D. Colorado.

Feb. 24, 1999.

Joseph T. Urbaniak, Jr., U.S. Atty's Office, Denver, CO, for Defendant.

Harvey Abe Steinberg, Springer & Steinberg, P.C., Denver, CO, for U.S.

### ORDER

DOWNES, District Judge.

This matter comes before the Court on the parties' Plea Agreement and Stipulation of Facts Relevant to Sentencing. The Court, having carefully reviewed the written materials submitted and the Presentence Investigation Report, having received testimony and heard the oral argument of counsel, and being otherwise fully advised in the premises, FINDS and ORDERS as follows:

### BACKGROUND

Jorge Carlos Rodriguez (hereinafter "Defendant" or "the defendant") was originally charged in a thirteen-count Indictment (hereinafter "original Indictment") in the District of Colorado as follows: a) one count alleging that from June 1989 to July 1992, Defendant conspired to possess with intent to distribute and to distribute five (5) kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; and b) seven counts alleging that in June 1989, June 1990, August 1990, June 1991, March 1992, and April 1992, Defendant possessed (or aided and abetted others in possessing) with intent to distribute five (5) kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). Following this Indictment, Defendant remained a fugitive for approximately two years. On January 26, 1995, federal authorities arrested Rodriguez in Miami, Florida, at which time he provided the authorities a false address and date of birth.

The government later determined that it could not establish venue over conduct charged by a significant portion of the original Indictment. As a result, Defendant was charged in a nine-count Superseding Indictment [1] as follows: a) one

---

1. The Assistant United States Attorney (hereinafter "AUSA") for the District of Colorado and the investigating case agents contacted the District of Wyoming about possibly presenting the dismissed portion of the original Indictment to a Wyoming grand jury. According to Special Agent Michael Stanfill of the Drug Enforcement Administration (hereinafter "SA Stanfill"), one of the defendant's alleged tractor-trailer drivers stated that he had transported cocaine from west to east via Interstate 80, which passes through Wyoming. The government also possessed a Western Union money transfer receipt which one of Defendant's alleged tractor-trailer drivers received in Wyoming. Sentencing Hearing Transcript of November 17, 1997 (hereinafter "Transcript # 2") at 10–11.

A grand jury was impaneled in the District of Wyoming, and received evidence over a period of several days. However, according to SA Stanfill, the AUSA for the District of Wyoming advised that "he did not want to return an indictment until Mr. Rodriguez' arrest because he did not know how long it

count alleging that from June 1989 through July 1992, Defendant conspired to possess with intent to distribute and to distribute five (5) kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; and b) three counts alleging that in June 1989 and June 1990, Defendant possessed (or aided and abetted others in possessing) with intent to distribute five (5) kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).

The parties subsequently entered into a Plea Agreement and Stipulation of Facts Relevant to Sentencing (hereinafter "Plea Agreement") pursuant to FED.R.CRIM.P. 11(e)(1)(C). In the Plea Agreement, the parties stipulated that in June 1989, Osmay Perez–Herrera (a co-defendant in this case) requested that Mario Lopez drive a tractor-trailer from New York, New York to Los Angeles, California, "pick up a load of cocaine," and return to New York. Defendant Rodriguez traveled separately from New York to Los Angeles in order to assist "in loading the tractor trailer with cocaine" as part of a "business enterprise" for profit, an activity which Defendant knew to be unlawful. The defendant assisted Lopez in loading approximately one hundred (100) kilograms of cocaine onto the tractor-trailer.

■ The parties' stipulated facts, however, grotesquely understate the defendant's relevant conduct. Under the Sentencing Guidelines, the sentencing range

for a particular offense is determined "on the basis of all 'relevant conduct' in which the defendant was engaged and not just with regard to the offense of conviction." *Witte v. United States*, 515 U.S. 389, 393, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995) (citing U.S. SENTENCING GUIDELINES MANUAL § 1B1.3). A defendant is accountable for all quantities of contraband "with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." *Id.*

With these principles in mind, the record reveals that in 1989, Defendant, a Cuban native, joined a co-defendant's drug-trafficking organization and began using tractor-trailers to transport cocaine across the United States.[2] Defendant has been directly linked to three such shipments between 1989 and 1990, totaling an estimated 899 kilograms of cocaine. In 1990, Defendant established a drug-trafficking organization independent of his co-defendant's organization and began utilizing his own "trucking" business to transport cocaine across the United States. Defendant has been directly linked to seven such shipments (or attempted shipments) between 1990 and 1992, encompassing five shipments of approximately 1,175 kilograms of cocaine, one shipment of 12 "burlap sacks" of cocaine, and one shipment of

would take for Rodriguez' arrest." *Id.* at 18. A period of over eighteen months elapsed, and the District of Wyoming declined to pursue the matter further. Despite having been prepared to indict the defendant, according to SA Stanfill, "after he was arrested, [the District of Wyoming] decided not to." *Id.* at 17. The AUSA for the District of Wyoming reportedly "conceded" that venue was proper in the District of Wyoming, but thought that "there was better venue in other jurisdictions and thought we should pursue an indictment there." *Id.* at 35.

Because the statute of limitations would run as to the dismissed portion of the original Indictment in approximately six months, and

based in part on the case agents' evaluation of the defendant's Plea Agreement in the pending Colorado case, the case agents and the AUSA for the District of Colorado began contacting other United States Attorney's offices (including Los Angeles, California, and Detroit, Michigan) about prosecuting the dismissed portion of the original Indictment. According to SA Stanfill, these offices "did not have a problem with the case. The only problem was the amount of time that it would take to prepare to get it indicted." *Id.* at 17.

**2.** The organization transported cocaine primarily from Los Angeles, California to Houston, Texas, New Orleans, Louisiana, Detroit, Michigan, and New York, New York.

an unspecified amount of cocaine.[3] Federal authorities estimate that up to a ton of cocaine per month was transported in this fashion. Transcript # 2 at 34.

Overall, the Probation Officer concluded that the defendant was directly involved in the possession or attempted possession of approximately 2,074 kilograms of cocaine, excluding the twelve "burlap sacks" and additional unspecified amount of cocaine.[4] Of this amount, 500 to 600 kilograms of cocaine are "readily provable" against the defendant. Sentencing Transcript of October 21, 1997 (hereinafter "Transcript # 1") at 35, 46; Transcript # 2 at 6–9, 13–14. The government seized approximately $1.5 million in assets connected to the defendant, including residences, condominiums, tractor-trailers, sports cars, jet skis, a long-wheel dragster, and a jeep. Transcript # 2 at 82–83.

Pursuant to the terms of the Plea Agreement, Defendant agreed to execute a Waiver of Indictment and plead guilty to a single count of traveling in interstate commerce with the intent to promote or facilitate unlawful activity, a violation of 18 U.S.C. § 1952. The maximum penalty for this offense is not more than five (5) years' imprisonment, a fine not to exceed $250,-000, supervised release not to exceed three (3) years, and a $50 special assessment. The defendant further agreed to truthfully debrief, testify for, and cooperate with the government. In turn, the government

agreed to file a motion pursuant to U.S. SENTENCING GUIDELINES MANUAL § 5K1.1 (1995) and 18 U.S.C. § 3553(e), recommending that the Court depart downward and sentence the defendant to time served and a term of probation. It further agreed not to prosecute the defendant in the District of Wyoming for conduct underlying the dismissed portion of the original Indictment, and to dismiss the original Indictment and Superseding Indictment altogether following the defendant's sentencing.

The parties further stipulated that: (a) Defendant's base offense level is 36; (b) due to the defendant's "minor role in the offense," the base offense level should be reduced to 34; (c) Defendant should receive a three-level reduction for acceptance of responsibility, resulting in a total offense level of 31; (d) the guideline range[5] for a total offense level of 31 is 108 – 135 months' imprisonment,[6] and a fine of between $15,000 – $150,000; (e) the maximum penalty for a violation of 18 U.S.C. § 1952 is sixty (60) months' imprisonment; and (f) pursuant to the Plea Agreement and § 5K1.1 motion, the government has made a binding recommendation of a sentence of imprisonment equivalent to the approximately ten months Defendant spent in pretrial detention, a period of supervised release of not more than three

3. According to SA Stanfill, this estimate is based primarily on the tractor-trailer drivers' recollection of the sizes and weights of boxes which they loaded onto trucks, and the testimony of other drivers which had been arrested. SA Stanfill admits that there are no written receipts, telephone records, hotel receipts, or fingerprints linking the defendant to conduct charged by the instant case. However, the government does possess such evidence as to the conduct charged by the dismissed portion of the original Indictment, including witness testimony, "paper trail" evidence, actual drug seizures, taped phone conversations, and wired money transfer receipts. This evidence, according to SA Stanfill, objectively corroborates the drivers' testimony regarding the instant case.

4. This total consists of approximately 127 kilograms of cocaine attributable to the offense of conviction, 772 kilograms attributable to the acts described in three counts of the Superseding Indictment, and 1,175 kilograms attributable the dismissed portion of the original Indictment, which the parties have agreed to dismiss pursuant to the Plea Agreement.

5. The November 1, 1995 edition of the U.S. SENTENCING GUIDELINES MANUAL has been used in this case.

6. The government estimated Defendant's criminal history to be "Category I," but notes that the Plea Agreement is not conditioned on the defendant qualifying for a particular criminal history category.

(3) years, and the requisite special assessment.

The Court conditionally accepted the parties' Plea Agreement, and ordered the Probation Officer to prepare a Presentence Investigation Report. Neither party submitted timely objections to the Presentence Investigation Report. Therefore, the Court accepts the factual representations of the Probation Officer as true for purposes of evaluating the Plea Agreement. The Court held a sentencing hearing on October 21, 1997, which was concluded on November 17, 1997.

The Probation Officer has evaluated factors applicable to the defendant's sentencing as follows: (a) Defendant's base offense level is 38,[7] which should be enhanced four levels because the defendant was an "organizer or leader" of a criminal activity involving five or more participants, resulting in a total base offense level of 42;[8] (b) Defendant should receive a three-level reduction for acceptance of responsibility, resulting in a total offense level of 39; (c) Defendant qualifies for three criminal history points, warranting a criminal history category of II; and (d) a total offense level of 39, combined with a

criminal history category of II, yields a guideline range of 292 – 365 months' imprisonment. Because the statutorily-authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily-authorized maximum sentence of sixty (60) months becomes the applicable guideline sentence.[9]

 The government argues the following in support of the Plea Agreement: a) the events in this case happened over nine years ago; b) the case against Mr. Rodriguez is a "no dope" case, based almost entirely upon the testimony of other persons who participated in the alleged conspiracy.[10] Accordingly, the case is "readily provable," but only "marginally triable"; c) the defendant assisted in loading and off-loading a truck on two occasions, and was a "minor participant" in the conduct charged by the Superseding Indictment; d) Defendant has forfeited all of the assets associated with his alleged conduct, and spent ten (10) months in pretrial detention; e) Defendant gave two sworn statements to the government; and f) several co-defendants who were more culpable than this defendant received immunity or were not prosecuted.[11]

7. This calculation is based on relevant conduct encompassing the possession with intent to distribute, and the distribution of one-hundred-fifty (150) kilograms or more of cocaine.

8. The Probation Officer agreed with the parties' additional stipulation that obstruction, victim-related and specific offense characteristic(s) adjustments are inapplicable.

9. U.S. Sentencing Guidelines Manual § 5G1.1(a) (1995).

10. SA Stanfill testified that at least four witnesses, including a co-defendant in the instant case, can identify the defendant as a member of the alleged conspiracy. Several witnesses have also provided credible information as to the defendant's role in the alleged conspiracy, which is corroborated by physical evidence pertaining to the dismissed portion of the original Indictment. Internal Revenue Service Agent Jerry Burke, an investigating agent, concurs in this assessment.

11. The Court recognizes that immunity and charging considerations, and their resulting

implications, reside in the government's sole discretion. With this in mind, the Court observes that four co-defendants who appear to be similarly-situated to the defendant have previously been sentenced to between forty (40) and eighty-four (84) months' imprisonment and between three (3) and five (5) years of supervised release. According to the government, however, two of these co-defendants were more culpable than Mr. Rodriguez, one co-defendant had a different and "less involved" role in the alleged conspiracy, and the co-defendant who had a role in the conspiracy similar to that of Mr. Rodriguez possessed different sentencing characteristics.

Six additional co-defendants have been sentenced for conduct related, and unrelated, to this case. Several of these co-defendants pleaded guilty to the charge of conspiracy to possess and to distribute three-hundred-sixty (360) kilograms of cocaine, which resulted in sentences of between forty-two (42) and two-hundred-four (204) months' imprisonment.

## STANDARD OF REVIEW

■ The parties have entered into a plea agreement which provides that a specific sentence is the appropriate disposition of this case. *See* FED.R.CRIM.P. 11(e)(1)(C). So long as a district court exercises sound judicial discretion in rejecting a tendered plea, Rule 11 is not violated. *U.S. v. Robertson*, 45 F.3d 1423, 1437 (10th Cir.1995). However, the district court's discretion to reject a plea agreement varies depending on the content of such a bargain. *Id.* at 1438.

■ Sentence bargains, which are predicated on the guarantee of a particular sentence, implicate the sentencing power of the district court. *Id.* at 1437. Charge bargains, which are predicated on the dismissal of some counts, implicate the charging power of the executive branch. Therefore, "hybrid" plea agreements in which a defendant agrees to plead guilty to certain charges in exchange for dismissing other charges, and the parties agree to a particular sentence, involve both judicial and prosecutorial discretion. *Id.* at 1438–39. A Rule 11(e)(1)(C) plea agreement directly and unequivocally infringes on the sentencing discretion of district courts, and rejecting such a plea agreement due to the court's refusal to permit the parties to bind its sentencing discretion constitutes the exercise of sound judicial discretion. *Id.* at 1439.

## DISCUSSION

■ The Plea Agreement at issue in this case is a "hybrid" plea agreement, implicating both judicial and prosecutorial discretion. However, certain aspects of the Plea Agreement, including the government's binding sentencing recommendation based primarily on its § 5K1.1 motion,

directly and unequivocally infringe upon this Court's sentencing discretion.

The government filed a Motion Pursuant to Section 5K1.1 of the Sentencing Guidelines, and Title 18, U.S.C., Section 3553(e), indicating that the defendant provided substantial assistance "to the Government and law enforcement authorities in the investigation or prosecution of other persons". who committed acts in violation of federal criminal law. According to the government, the defendant (a) gave two sworn statements detailing his, and others,' involvement in drug trafficking;[12] (b) is prepared to be called in the future as a witness during the trial of a more culpable co-defendant; and (c) assisted the government in forfeiting approximately $1.5 million in assets related to his unlawful conduct. The government contends that the information Defendant provided is truthful, complete, and reliable.

By virtue of its Motion, the government seeks a substantial departure from sixty months' imprisonment (the statutory maximum penalty for the offense to which Defendant has pleaded guilty pursuant to the Plea Agreement) to the approximately ten months' imprisonment the defendant served in pretrial detention. It is worth emphasizing, however, that in effect the Plea Agreement reduces the defendant's sentence from between 292 and 365 months' imprisonment under the applicable U.S. Sentencing Guidelines to a mere ten months' imprisonment.

■ Section 5K1.1 of the U.S. SENTENCING GUIDELINES MANUAL (1995) provides that:

> Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has

---

**12.** Defendant offered to participate in proactive cooperation, but the government, as well as the case agents, were reluctant because the defendant had been a fugitive for approximately two years prior to his arrest, and the defendant indicated that his sources always contacted him, and not vice versa (sudden proactive contact would raise the suspicion of the defendant's sources). Transcript # 2 at 11–12; Defendant's Sworn Statement of February 24, 1995.

committed an offense, the court may depart from the guidelines.

(a) The appropriate reduction shall be determined by the court for reasons stated that may include, but are not limited to, consideration of the following:

(1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance provided;

(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant; [13]

(3) the nature and extent of the defendant's assistance; [14]

\*\*\*

(5) the timeliness of the defendant's assistance.

"Section 5K1.1 gives a district court substantial discretion to depart downward from the guidelines after considering a nonexhaustive list of relevant factors including the 'significance and usefulness' of the defendant's assistance." *U.S. v. Blackwell,* 127 F.3d 947, 959 (10th Cir.1997) (citation omitted). The extent of a departure under § 5K1.1 remains within the sentencing court's sound discretion. *Id.*

■ With regard to Defendant's purported assistance in forfeiting his assets, the AUSA for the District of Colorado discussed Florida's restrictions upon asset forfeitures. Due to such restrictions, title to some of Defendant's assets could not be conveyed to the government without the defendant's assent.[15] Cooperation relating to the forfeiture of assets, however, is not within the purview of U.S. Sentencing Guidelines Manual § 5K1.1 (1995). Application Note 2 to § 5K1.1 states that [t]he sentencing reduction for assistance to authorities shall be considered independently of any reduction for acceptance of responsibility. Substantial assistance is directed to the investigation and prosecution of criminal activities by persons other than the defendant, while acceptance of responsibility is directed to the defendant's affirmative recognition of responsibility for his own conduct.

The forfeiture of assets is not sufficiently "directed to the investigation and prosecution of criminal activities by persons other than the defendant," but pertain more "to the defendant's affirmative recognition of responsibility for his own conduct." *See U.S. v. Sanchez,* 927 F.2d 1092, 1093–94 (9th Cir.1991) (holding that assistance provided in a civil forfeiture proceeding is not "substantial assistance" within the meaning of Section 5K1.1, and stating that "by its plain language, Section 5K1.1 applies only to assistance provided in the investigation or prosecution of another person").

The government also asserts that the defendant participated in loading and off-loading narcotics on just two occasions, and was a "minor participant" in the conduct charged. The defendant's culpability relative to that of his co-defendants, however, seems irrelevant in evaluating whether the defendant provided substantial assistance to the government. Even if arguably relevant, the record plainly does not support the government's assertions. Considering the defendant's role in the alleged conspiracy, especially his supervision of numerous individuals in furtherance of the conspiracy, it is abundantly

---

13. Neither party suggests that the defendant provided untruthful, incomplete, or unreliable information to the government, except that SA Stanfill "feel[s] there are still assets out there" which the defendant has not forfeited. Transcript # 1 at 44–45.

14. Application Note 3 to § 5K1.1 states that "[s]ubstantial weight should be given to the government's evaluation of the extent of the defendant's assistance, particularly where the extent and value of the assistance are difficult to ascertain."

15. SA Stanfill, however, stated that there were still "problems getting the property seized because the property had not yet been signed over by Mr. Rodriguez." Transcript # 1 at 39.

clear that Mr. Rodriguez was not a "minor participant." *See* U.S. SENTENCING GUIDE-LINES MANUAL § 3B1.1(a) and Application Note 2 (1995).

The Probation Officer testified that, based on his review of court documents and sworn testimony from previous hearings in this case, Defendant "was not a minor participant but was in fact a supervisor or an organizer or leader of the other activities which were dismissed out of the original indictment and which were later brought to Wyoming for review." Transcript # 2 at 76. According to SA Stanfill, Defendant had the ability to directly contact the source of the cocaine (usually Colombian) in Los Angeles, arrange for someone to retrieve the cocaine from the source, arrange the personnel and equipment (by directing the actions of numerous individuals) necessary to transport the cocaine across the United States, and personally assist in loading and unloading the cocaine. Transcript # 1 at 34, 44. SA Stanfill further opines that the defendant is as culpable as several co-conspirators who were indicted and sentenced in this case. *Id.* at 34.

Defendant gave a sworn statement on February 24, 1995,[16] and another sworn statement on March 24, 1995, upon which the government relies heavily to support its § 5K1.1 motion. The statements contain Defendant's somewhat fractured, "piecemeal" colloquy to SA Stanfill and an Assistant United States Attorney; a "debriefing" of sorts. Considering the marginal significance and usefulness of the

defendant's sworn statements, as well as the nature and extent of the information provided by Defendant in the statements, the Court concludes that the sworn statements do not warrant a departure for substantial assistance under § 5K1.1. To the extent that the sworn statements may have assisted the government, the assistance provided certainly does not justify a departure of the magnitude the parties seek in this case.[17]

In the first statement, Defendant provided general background information about himself, details as to how he began drug-trafficking with his co-defendant, and a general account of his own drug-related activities (some of which appear directly related to the charged conspiracy, and others which seem irrelevant to the charged conspiracy).[18] Defendant also offered to locate a person in Miami who claimed to be a fugitive, but the record does not indicate whether the case agents or the AUSA acted upon this offer. In the second statement, Defendant identified several individuals pictured in photographs, offered hearsay information regarding the murder of a person who had "snitched" concerning a drug "rip-off," a traced the distribution of the drugs which had been "ripped off." He also provided further details concerning his individual drug activities and the logistics of his drug transactions, and summarily named others involved in several transactions.

SA Stanfill, who was present during both statements, testified that the defendant's statements did not contribute mean-

---

**16.** The statement's cover pages are dated February 24, 1994, but the corresponding transcript certification indicates that the statement was in fact given on February 24, 1995.

**17.** The government has not identified, with specificity, any action it took based on the defendant's statements, or how the statements otherwise contributed to the investigation and prosecution of this, or any other, case. Furthermore, the government reported to the Probation Office that Defendant's cooperation is ongoing, thereby enabling the government to bolster its Motion. To date, however, the Court has not been provided with any addi-

tional, purported justification to support such a dramatic departure for substantial assistance. It is the opinion of this Court that if such a justification has not been identified by now, it never will be.

**18.** For example, Defendant describes his transition from a co-defendant's drug-trafficking organization to his independent drug-trafficking activities, a vague account of his contacts with Colombian individuals, and events surrounding the resolution of his drug-related debts and a shipment of "lost merchandise."

ingfully to his investigation "because most of the information that we talked about was information that we knew of, and during debriefings we were using them to gauge the honesty of Mr. Rodriguez." Transcript # 1 at 35. In other words, "all it did was corroborate what we already . . . knew. We weren't there basically to get into new type information or anything proactive. It was just basically to try and verify his truthfulness." Transcript # 2 at 11. Indeed, during Defendant's March 24, 1995 statement, SA Stanfill informed Defendant's counsel that "[y]ou know a lot of stuff that he's telling us he's just corroborating what we already know, so we know it's true." Defendant's Sworn Statement of March 24, 1995 at 88.

Defendant's statements are also vague as to the names and identities of his contacts, the time frames of the events he referred to, and the quantity of drugs involved in his activities. In addition, the information provided by Defendant pertained primarily to the defendant himself, not to the investigation and prosecution of other persons.

The government contends that the defendant also provided substantial assistance by his willingness to testify at the trial of a more culpable co-defendant. However, the defendant's willingness to testify is not sufficiently significant or useful to constitute "substantial assistance" under § 5K1.1. The Court previously accepted a Rule 11(e)(1)(c) Plea Agreement between the government and this co-defendant which resulted in a sentence of eighty-four (84) months' imprisonment.[19] Further, the defendant's willingness to testify did not contribute meaningfully to the government's ability to obtain a guilty plea from this co-defendant.[20] According to the Probation Officer, the government's evidence against the co-defendant was "very strong" and "Mr. Rodriguez' testimony was really not needed."[21] Transcript # 2 at 81. The AUSA for the District of Colorado apparently concurs, indicating that the case against this co-defendant did not "depend on the testimony of any one witness. There are records, documents and everything and a number of witnesses on him." *Id.* at 86.

A final factor for the Court's consideration is the timeliness of the defendant's assistance. Defendant remained a fugitive for approximately two years until federal authorities arrested him on January 26, 1995. It was only after his arrest, and a two-year foray as a fugitive, that the defendant began to cooperate with the government. This, too, weighs against a finding of "substantial assistance" on behalf of the defendant.

The Probation Officer concluded that, based on his review of the record and his discussions with SA Stanfill and the AUSA, he could "not collect any information that would substantiate that . . . there was enough cooperation, significant cooperation, to justify a 5K1.1 departure down to the stipulated sentence."[22] Transcript # 2 at 78.

For these reasons, the Court cannot accept the parties' Plea Agreement. In so concluding, the Court is mindful of the statement contained in U.S. Sᴇɴᴛᴇɴᴄɪɴɢ

---

19. In *United States v. Perez–Herrera*, Docket No. 92–CR–248–02, the Court accepted a Fᴇᴅ. R.Cʀɪᴍ.P. 11(e)(1)(C) Plea Agreement that involved a dramatic departure from the calculated sentence under the Guidelines. In that case, however, the Court accepted the government's § 5K1.1 Motion based, in part, upon the Probation Officer's conclusion that the defendant's assistance in fact warranted an extraordinary departure.

20. In fact, it appears that the more culpable co-defendant cooperated meaningfully with the government against Mr. Rodriguez. Transcript # 2 at 77.

21. The Probation Officer's assessment was based on information obtained from SA Stanfill.

22. The Probation Officer admittedly did not review the Defendant's sworn statements.

GUIDELINES MANUAL § 6B1.2 (1995),[23] which provides that a court may accept a Rule 11(e)(1)(C) plea agreement if it is satisfied that "the agreed sentence is within the applicable guideline range" or "the agreed sentence departs from the applicable guideline range for justifiable reasons." It is readily apparent from the record, particularly the evidence reflecting the relevant conduct attributable to this defendant, that the parties have not satisfied either of these criterion.

In response to the Court's concern regarding the disposition of this case in the event that the tendered plea was rejected, the AUSA for the District of Colorado adamantly pronounced "I can't drop the case and I won't drop the case." Transcript # 2 at 83. It remains to be seen whether the government will honor this assertion.

The Plea Agreement offered by the parties in this case implicates several dangers associated with accepting plea agreements that drastically depart from the Sentencing Guidelines. While some courts may be willing to stray far from the Guidelines, utilizing Rule 11(e)(1)(C) as a vehicle to reach what is perceived to be "more acceptable" sentencing results, the recommended sentence in the instant case is patently unacceptable and impinges upon the very concept of justice.

While the Court is cognizant of the need for flexibility in obtaining guilty pleas and the government's substantial discretion in such matters, a judge's already-restricted sentencing discretion is often too easily surrendered. Proceedings before this Court suggest that in the everyday application of the Guidelines to the all-encompassing drug conspiracy charge, "nickel-and-dime" drug addicts suffer the full force of mandatory minimum sentences based on their relevant conduct. At the same time, guilty pleas obtained through contrived charges, "substantial assistance" departures and drastically-reduced Rule 11(e)(1)(C) sentence recommendations allow the government to extend benefits to significantly more culpable conspirators. As defense counsel aptly admits, "this is a capitalist system, and the one who has the most gets the most." Transcript # 2 at 88. The instant case is a glaring example of this practice, and baldly undermines the legal principles and policies established by the United States Sentencing Commission.

## CONCLUSION

Few federal laws have been more heatedly debated in legal circles than has the *Sentencing Reform Act of 1984*. The law remains widely unpopular among District Judges and it is not surprising that some attempt to wriggle free of the Act's most onerous provisions. Indeed, the Supreme Court's decision in *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), is widely perceived as marking the triumphant return of discretion to sentencing judges. In the opinion of this judge, however, the promise of *Koon* remains largely illusory. It cannot be overlooked that the Sentencing Commission, by

**23.** The Commentary to this section provides that

[t]he court may accept an agreement calling for dismissal of charges or an agreement not to pursue potential charges if the remaining charges reflect the seriousness of the actual offense behavior. This requirement does not authorize judges to intrude upon the charging discretion of the prosecutor. If the government's motion to dismiss charges or statement that potential charges will not be pursued is not contingent on the disposition of the remaining charges, the judge should defer to the government's position except under extraordinary circumstances. However, when the dismissal of charges or agreement not to pursue potential charges is contingent on acceptance of a plea agreement, the court's authority to adjudicate guilt and impose sentence is implicated, and the court is to determine whether or not dismissal of charges will undermine the sentencing guidelines.

The government's proposed dismissal in this case is disconcerting, considering the disparity between the defendant's sentencing guideline range and the parties' stipulated sentence.

administrative fiat, can always slam shut the already narrow window of opportunity for the sound exercise of judicial discretion.

Nonetheless, however disgruntled this Court or any other court may be regarding the efficacy and fairness of the current Sentencing Guidelines, such displeasure does not give license to avoid the law. Resisting the temptation to skirt the law is made undeniably more difficult by prosecutors who invite a judge to engage in questionable sentencing practices. Their siren's song may contain any number of appealing themes, including:

- "The sentence is too harsh and equity dictates that the Court accept a 5K1.1 Motion for Downward Departure to achieve a more desirable result." (turning a blind eye to the Motion's obvious infirmities)

- "Don't tag the defendant with the full extent of his complicity in drug trafficking, because the full amount of drugs initially seized are not readily provable as to this defendant." (even if the evidence is clearly to the contrary).

- "Technically speaking, Judge, the sentence is not contemplated by the guidelines, but there is no cause for worry because neither the prosecution nor the defendant will appeal." (put another way, "So what if the sentence is unlawful, what the Court of Appeals doesn't know, won't hurt it.")

It is essential, however, that sentencing judges blow the whistle in those instances where, as here, the Guidelines are being circumvented. Judicial defiance and prosecutorial chicanery, concealed from the scrutiny of appellate judges and the Sentencing Commission, even if for reasons which seem palatable, will not incite reform.

While Congress sought national uniformity in sentencing similarly situated defendants and, to that end, constrained the discretion of federal judges, it has perhaps unwittingly given enormous, often unfet-

tered, discretion to federal prosecutors. In the long term, this quantum shift of judicial authority into the hands of the executive branch may have a most profound and pernicious effect upon our criminal justice system. To accept the Plea Agreement in this case would only further denigrate the role of this federal judge in the sentencing process.

**THEREFORE,** it is hereby

**ORDERED** that the parties' Plea Agreement is REJECTED. It is further

**ORDERED** that, pursuant to FED. R.CRIM.P. 11(e)(4), the defendant may withdraw his guilty plea.